IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| STANLEY BOIM, individually and as Administrator of the Estate of DAVID BOIM, Deceased, and JOYCE BOIM | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil Action No. 1:04-CV-793 (JDB) |
| OFFICE OF FOREIGN ASSETS CONTROL, UNITED STATES DEPARTMENT OF THE TREASURY | ) ) ) ) |
| Defendant. | ) ) |

_____

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), defendant United States Department of the Treasury, Office of Foreign Assets Control hereby respectfully moves for an order dismissing this action. As set forth in detail in the accompanying memorandum, the basis for this motion is that the Court lacks jurisdiction over the subject matter of this case and plaintiffs have failed to state a claim upon which relief may be granted.

Dated: July 12, 2004

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

VINCENT GARVEY
Deputy Branch Director

/S/ Andrew I. Warden
ANDREW I. WARDEN, IN # 23840-49
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC  20530
Tel.: (202) 616-5084
Fax: (202) 616-8460
e-mail:  andrew.warden@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
STANLEY BOIM, individually and as          )
Administrator of the Estate of DAVID       )
BOIM, Deceased, and JOYCE BOIM             )
                                           )
    Plaintiffs,                      )
                                           )
       v.                           )      Civil Action No. 1:04-CV-793 (JDB)
                                           )
OFFICE OF FOREIGN ASSETS                   )
CONTROL, UNITED STATES                     )
DEPARTMENT OF THE TREASURY                 )
                                           )
    Defendant.                       )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND IN
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION**

## INTRODUCTION

Plaintiffs request that the Court enjoin the Department of the Treasury's Office of Foreign

Assets Control ("OFAC") from releasing the blocked assets of the Holy Land Foundation for

Relief and Development ("HLF") to any party who has not obtained a judgment against HLF.

Plaintiffs filed the present action in response to the fact that competing litigants, namely the

Ungar plaintiffs, recently obtained a substantial monetary judgment against Hamas, a designated

terrorist party.  According to plaintiffs, the Ungars intend to execute their judgment against the

blocked assets of HLF, pursuant to section 201(a) of the Terrorism Risk Insurance Act ("TRIA"),

based on the theory that HLF is an agent or instrumentality of Hamas.  Plaintiffs presently have

their own action for monetary damages pending against HLF and wish to preserve HLF's assets

in the event they prevail in their lawsuit.  Consequently, plaintiffs urge the Court to adopt a

limiting construction of section 201(a) that runs contrary to the plain language of the statute in

order to protect these assets from attachment by the Ungars.

Plaintiffs' requested relief must be denied and their complaint dismissed because, for two reasons, the Court does not have jurisdiction to hear this case. First, plaintiffs' claims are not ripe under Article III standards because OFAC has not taken any action to license the transfer of HLF's assets. Plaintiffs cannot identify any OFAC action that has adversely impacted their rights, thus they effectively ask the Court to issue an advisory opinion based on allegations of hypothetical and speculative future OFAC action that has yet to occur, and, indeed, may never occur.

Second, plaintiffs do not have standing to maintain the present action because they have yet to secure a final judgment for monetary damages against HLF. Plaintiffs lack standing because any legal claim they have to HLF's blocked assets is contingent upon the outcome of their pending suit for damages against HLF. Plaintiffs presently do not have an award for damages against HLF or a legally cognizable interest in HLF's blocked property; thus they have not alleged a sufficiently concrete injury to warrant the exercise of this Court's jurisdiction.

Even assuming the Court has jurisdiction, moreover, plaintiffs have failed to state a claim upon which relief can be granted because their complaint does not identify a cause of action that would permit them to sue OFAC, an agency of the United States protected by sovereign immunity. Plaintiffs' claims could only be cognizable–if at all–under the Administrative Procedure Act ("APA") as a challenge to OFAC action. Plaintiffs, however, fail to identify the APA as a cause of their action, and, in any event, fail to identify any final agency action that causes them harm, a necessary prerequisite to bringing an APA action.

Finally, plaintiffs cannot prevail on the merits of their claim that section 201(a) of TRIA

authorizes the release of blocked terrorist assets only to persons who have in personam judgments against that specific terrorist entity.  The plain text of TRIA is not so limited.  TRIA explicitly provides that parties with judgments against terrorist parties may satisfy those judgments against certain assets of "that terrorist party" as well as against those of "any agency or instrumentality of that terrorist party."

For the foregoing reasons, as elaborated below, the Court does not have jurisdiction over this action because plaintiffs' claims are not ripe and because plaintiffs lack Article III standing. See Fed. R. Civ. P. 12(b)(1).  Plaintiffs also have failed to state a claim upon which relief can be granted because they have not asserted a cause of action under the APA and their construction of TRIA conflicts with the plain statutory text.  See Fed. R. Civ. P. 12(b)(6).  Accordingly, OFAC's motion to dismiss should be granted and, because plaintiffs cannot meet the requirements for a preliminary injunction, their motion for that relief should be denied.

## BACKGROUND

This case involves the intersection between various statutes and administrative orders related to the Executive Branch's authority to block and freeze assets of two designated terrorist parties:  Hamas and HLF.  To understand the context in which plaintiffs brought this action, a familiarity is needed with these various sources of law as well as two related cases involving attempts by victims of terrorism to obtain monetary judgments in federal court against Hamas and HLF for acts of terrorism.  This section begins by explaining the sources of legal authority that permit the Executive Branch to block assets of terrorist parties, focusing on section 201(a) of TRIA, a recently-enacted federal statute that permits persons with judgments against a terrorist party to execute their judgments against the blocked assets of that terrorist party as well as

against the blocked assets of any agency or instrumentality of that terrorist party.  The section

then moves on to discuss the two related lawsuits, one brought by plaintiffs in Illinois against

HLF and the other brought by the Ungar plaintiffs in Rhode Island against Hamas, that form the

basis for the present action.

I.      **The Sources of Legal Authority to Control the Assets of Hamas and HLF
        Located Within the United States.**

A.  Historical Overview

For virtually its entire history, the United States has utilized economic sanctions as a tool

in its foreign policy and national security arsenals.  During much of the 20th century, United

States sanctions programs were governed by the Trading with the Enemy Act ("TWEA").  See

Act of Oct. 6, 1917, ch. 106, 40 Stat. 411 (codified as amended at 50 U.S.C. app. §§ 1-44).

TWEA granted the President "broad authority" to "investigate, regulate, . . . prevent or prohibit

. . . transactions" involving the assets of a foreign country in times of war or declared national

emergencies.[1]  See 50 U.S.C. app. § 5(b); Dames & Moore v. Regan, 453 U.S. 654, 672 (1981).

The authority TWEA conveys to the President to regulate, prevent, or prohibit transactions

consistently has been interpreted to encompass the power to block or freeze an entity's property.

See, e.g., Orvis v. Brownell, 345 U.S. 183, 186-88 (1953); Propper v. Clark, 337 U.S. 472, 483-

84 (1949).

B.  IEEPA

 In 1977, Congress restricted TWEA's application solely to times of declared war,

---

[1]  "As originally enacted, TWEA dealt only with the President's use of economic powers
in times of war.  The Act was expanded to deal with peacetime national emergencies in 1933."
Regan v. Wald, 468 U.S. 222, 226 n.2 (1984).

see Regan v. Wald, 468 U.S. 222, 227-28 (1984), and created a new statutory scheme, the

International Emergency Economic Powers Act ("IEEPA") (codified at 50 U.S.C. §§ 1701-1706,

as amended), authorizing the President to take certain actions during peacetime crises.  In order

to invoke IEEPA's statutory authority, the President must declare a national emergency "to deal

with any unusual and extraordinary threat, which has its source in whole or substantial part

outside the United States, to the national security, foreign policy, or economy of the United

States."  See 50 U.S.C. § 1701(a).  Once the President issues this declaration, IEEPA, as

amended, authorizes the President to:

> investigate, block during the pendency of an investigation, regulate, direct and
> compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding,
> use, transfer, withdrawal, transportation, importation or exportation of, or dealing
> in, or exercising any right, power or privilege with respect to, or transactions
> involving, any property in which any foreign country or a national thereof has any
> interest by any person, or with respect to any property, subject to the jurisdiction
> of the United States . . . .

Id. § 1702(a)(1)(B).

C. Executive Order 12,947

In 1995, President Clinton invoked IEEPA's statutory authority, declaring that the "grave

acts of violence committed by foreign terrorists that disrupt the Middle East peace process

constitute an unusual and extraordinary threat to the national security, foreign policy, and

economy of the United States."  Exec. Order No. 12,947, 60 Fed. Reg. 5079-81 (Jan. 25, 1995).

Pursuant to this declaration, President Clinton designated the Islamic Resistance Movement, a

Palestinian military and political organization, also known as Hamas, a "Specially Designated

Terrorist" ("SDT") and blocked all of its "property and interests in property."[2]  Id.

    D.  Executive Order 13,224

    In 2001, following the attacks of September 11, President Bush invoked IEEPA's power, finding "that the grave acts of terrorism and threats to terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon . . . constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  Exec. Order No. 13,224, 66 Fed. Reg. 49,079-83 (Sept. 25, 2001).  Expanding on the Executive Order issued by President Clinton, Executive Order 13,224 blocks all property and interests in property in the United States, or within the "possession or control" of United States persons, of designated terrorist organizations known as "Specially Designated Global Terrorists," or SDGTs.  Id.  On October 31, 2001, Hamas was designated as one of the SDGTs subject to Executive Order 13,224.  See Holy Land Found. For Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57, 63 (D.D.C. 2002), aff'd 333 F.3d 156 (D.C. Cir. 2003), cert. denied 124 S. Ct. 1506 (2004) (hereinafter "Holy Land").

    Executive Order 13,224 further authorizes the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to block the property of designated "persons" (defined as individuals or entities) who "act for or on behalf of" or are "owned or controlled by" designated terrorists.  Exec. Order No. 13,224, Sec. 1-2, 66 Fed. Reg. 49,079-80

---

    [2] In 1997, the Secretary of State designated Hamas as a "foreign terrorist organization" pursuant to 8 U.S.C. § 1189.  The Secretary reaffirmed this designation in 2003.  See Redesignation of Foreign Terrorist Organizations, 68 Fed. Reg. 56,860 (October 2, 2003).

(Sept. 25, 2001).[3]  On December 4, 2001, the Secretary of the Treasury designated HLF, a non-profit corporation organized under California law, as an SDT and SDGT under Executive Orders 12,947 and 13,224 because HLF "acts for or on behalf of" Hamas.  See Holy Land, 219 F. Supp. 2d at 64; Additional Designations of Terrorism-Related Blocked Persons, 67 Fed. Reg. 12,644-46 (Mar. 19, 2002); see also Affidavit of John M. Eubanks, in Support of Pls' Motion for Preliminary Injunction, Affidavit Exhibit D, Designation and Blocking Memorandum.  Pursuant to this designation, OFAC issued a "Blocking Notice" prohibiting all transactions involving property in which HLF has any interest absent a specific authorization license from OFAC.  Holy Land, 219 F. Supp. 2d at 64.

E.  Holy Land Foundation For Relief & Development v. Ashcroft (D.D.C.)

HLF subsequently challenged its designation as an SDT and SGDT in the United States District Court for the District of Columbia, claiming that OFAC's decision was arbitrary and capricious under the APA.  See Holy Land Found. For Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57 (D.D.C. 2002) (Civil Action No. 02-442 (GK)).  The district court rejected HLF's argument because the "seven volume, 3130 page administrative record in this case provides substantial support for OFAC's determination that HLF acts for or on behalf of Hamas."  Id. at 69.  On appeal, the United States Court of Appeals for the District of Columbia affirmed the district court's decision.  See Holy Land Found. For Relief & Dev. v. Ashcroft, 333 F.3d 156, 167 (D.C. Cir. 2003) ("Therefore, we uphold the district court's affirmance of the Treasury Department's decision to designate HLF as an SDGT and to block its assets"), cert. denied 124 S.

_____

[3] Executive Order 12,947 contains a similar provision.  See Exec. Order No. 12,947, Sec. 1-2, 60 Fed. Reg. 5,079-80 (Jan. 25. 1995).

Ct. 1506 (2004).[4]

## II.  The Terrorism Risk Insurance Act ("TRIA")

In November 2002, Congress enacted the Terrorism Risk Insurance Act ("TRIA"), Pub.

L. No. 107-297, 116 Stat. 2322, 2337-39 (November 26, 2002).  Prior to TRIA's enactment,

blocked assets of terrorist parties could not be attached or executed against in order to satisfy

judgments against terrorist parties for two reasons.  First, as described above, assets of various

terrorist parties, including Hamas and HLF, have been blocked pursuant to the President's

authority under IEEPA, implementing Executive Orders, and OFAC's blocking notices.  Under

OFAC's blocking regulations, the blocking of these assets means that they cannot be transferred

for any purpose except to the extent otherwise provided by law or unless licensed by OFAC.  See

31 C.F.R. §§ 594.201(a), 594.202(e).  Second, although the Foreign Sovereign Immunities Act

("FSIA") permits the collection of judgments from the blocked or regulated assets of a "foreign

state," defined as "a political subdivision of a foreign state or an agency or instrumentality of a

foreign state," see 28 U.S.C. §§ 1603, 1610(f)(1)(A), the provisions authorizing the attachment of

blocked and regulated assets specifically grants the President the power to waive this limited

authority.  See 28 U.S.C. § 1610(f)(3).  Pursuant to FSIA's statutory authority and in exercising

his constitutional duty to conduct foreign policy, the President has waived FSIA's attachment

provisions since 1998.  See Presidential Determination No. 99-1, 63 Fed. Reg. 59,201 (Oct. 21,

1998); Presidential Determination 2001-03, 65 Fed Reg. 66,483 (Nov. 6, 2000); see also Flatow

---

[4] HLF also raised claims under the Religious Freedom Restoration Act as well as the First, Fourth, and Fifth Amendments to the United States Constitution.  The district court granted the government's motion to dismiss and for summary judgment with respect all claims except HLF's Fourth Amendment claim.  See Holy Land, 219 F. Supp. 2d at 85.  The court of appeals affirmed this decision.  See Holy Land, 333 F.3d at 167-68.

v. Islamic Republic of Iran, 76 F. Supp. 2d 16, 25-28 (D.D.C. 1999) (discussing FSIA's

limitations on what a terrorist judgment holder could attach).

    With the enactment of TRIA, Congress amended existing law regarding the

"[s]atisfaction of judgments from blocked assets of terrorists, terrorist organizations, and State

sponsors of terrorism." See 116 Stat. 2337.  Through TRIA, Congress thus provided a

mechanism by which certain assets of a terrorist party (as well as any agency or instrumentality

of that terrorist party) are subject to execution or attachment in aid of execution which

theretofore had not been available.  Specifically, section 201(a) of TRIA authorizes the

attachment of certain blocked assets by judgment holders, as follows:

> Notwithstanding any other provision of law, and except as provided in subsection
> (b), in every case in which a person has obtained a judgment against a terrorist
> party on a claim based upon an act of terrorism, or for which a terrorist party is
> not immune under section 1605(a)(7) of title 28, United States Code, *the blocked
> assets of that terrorist party (including the blocked assets of any agency or
> instrumentality of that terrorist party) shall be subject to execution or attachment
> in aid of execution* in order to satisfy such judgment to the extent of any
> compensatory damages for which such terrorist party has been adjudged liable.

116 Stat. 2337, TRIA § 201(a) (emphasis added).  The term "terrorist party" means "a terrorist, a

terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality

Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism

under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section

620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)." 116 Stat. 2337, TRIA §

201(d)(4).  Furthermore, TRIA defines a "blocked asset" as "any asset seized or frozen by the

United States under section 5(b) of the Trading With the Enemy Act or under sections 202 and

203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)." 116 Stat.

2337, TRIA § 201(d)(4).  TRIA therefore provides a means for persons with judgments against a

terrorist party based on acts of terrorism to reach certain assets of that terrorist party (including

the assets of any agency or instrumentality of that terrorist party) that had previously not been

available under United States law.  See H.R. Rep. No. 107-779, at 27 (2002), reprinted in 2002

U.S.C.C.A.N. 1430, 1434 (stating that "[s]ection 201 builds upon and extends the principles in

section 1610(f)(1) of the Foreign Sovereign Immunities Act").

### III.    Civil Litigation Against Hamas and HLF Seeking Monetary Damages for Acts of International Terrorism

A.  Boim, et al. v. Quranic Literacy Institute, et al. (N.D. Ill.)

Plaintiffs in the present action are the parents of David Boim, a 17-year-old American

citizen killed by Hamas terrorists while studying in Israel in 1996.  In May 2000, plaintiffs filed

suit against HLF, but not Hamas, in the United States District Court for the Northern District of

Illinois.[5]  See Boim, et al. v. Quranic Literacy Institute, et al., Case No. 00-2905 (N.D. Ill.).

Plaintiffs allege that HLF is civilly liable for their son's death under 18 U.S.C. § 2333, which

creates a cause of action for the "estate, survivors, or heirs" of "any national of the United States

injured in his or her person, property or business by reason of an act of international terrorism."

In September 2000, HLF filed a motion to dismiss the complaint for failure to state a claim.  The

district court denied HLF's motion to dismiss, concluding that plaintiffs' claim could proceed on

two separate legal theories.  See Boim, et al. v. Quranic Literacy Institute, et al., 127 F. Supp. 2d

1002 (N.D. Ill. 2001).  First, plaintiffs may show that HLF engaged in acts of international

terrorism subject to civil liability under section 2333 by proving that HLF provided material

---

[5] Plaintiffs also sued several United States-based corporations, non-profit organizations, and individual defendants with alleged connections to Hamas.

support to Hamas in violation of 18 U.S.C. §§ 2339A, 2339B, the criminal statutes prohibiting the provision of material support or resources to terrorists.  See id. at 1015-17.  Second, plaintiffs may establish liability under section 2333 on the theory that HLF aided and abetted an act of international terrorism committed by Hamas.  See id. at 1017-18.  On interlocutory appeal, the United States Court of Appeals for the Seventh Circuit affirmed the district court's decision.  See Boim, et al. v. Quranic Literacy Institute, et al., 291 F.3d 1000, 1028 (7th Cir. 2002).

Since the Seventh Circuit issued its decision in June 2002, plaintiffs and HLF have engaged in extensive discovery.  According to plaintiffs' counsel in the Illinois action, discovery between the parties closed on April 15, 2004.  See Affidavit of John M. Eubanks, in Support of Pls' Motion for Preliminary Injunction, ¶ 13.  Plaintiffs subsequently filed a motion for partial summary judgment on the issue of liability against HLF on June 2, 2004.  Id. at ¶ 19.  At present, briefing on this motion is scheduled to conclude on August 26, 2004.  Id.

B.  The Estates of Ungar, et al. v. The Palestinian Authority, el al. (D.R.I.)

In a similar action brought in the United States District Court for the District of Rhode Island in March 2000, the Ungar plaintiffs sued Hamas directly, but not HLF, alleging that Hamas is civilly liable under 18 U.S.C. § 2333 for the death of Yaron Ungar, a United States citizen killed by a Hamas terrorist attack in Israel in 1996.[6]  See The Estates of Ungar, et al. v. The Palestinian Authority, el al., Civil Action No. 00-105.  In January 2004, the district court entered final default judgment against Hamas and awarded the Ungars $116 million in damages. See The Estates of Ungar, et al. v. The Palestinian Authority, el al., 304 F. Supp. 2d 232 (D.R.I.

---

[6] The Ungar plaintiffs also sued a host of other defendants, including the Palestinian Authority, the Palestine Liberation Organization, Yasser Arafat, and the individual Hamas members who carried out the terrorist attack that resulted in the death of Yaron Ungar.

2004) (adopting the Report and Recommendation of the Magistrate Judge except as to the issue

of prejudgment interest).  In reaching this decision, the court stated the following:  "The HLF is

an agency or instrumentality of Hamas because it 'acts for or on behalf of' Hamas as Hamas'

fund-raising agent in the Untied States.  Therefore, HLF's blocked assets are also subject to

attachment and execution under the TRIA in order to satisfy the present judgment against

Hamas."  Id. at 241.

Following entry of the judgment, the Ungars served a subpoena on OFAC in February

2004 requesting a "list containing full details of all Hamas-related blocked assets."  See Pls' Ex.

1.  OFAC released responsive information to the Ungars pursuant to a protective order issued by

Judge Emmet G. Sullivan of this Court on May 7, 2004.  See Pls' Ex. 2.  One week later, fearing

that the Ungars would rely on section 201(a) of TRIA to execute their judgment against Hamas

by attaching HLF's assets, plaintiffs filed their complaint in this case seeking to enjoin OFAC

from releasing HLF's blocked assets.  Plaintiffs' complaint, however, does not allege, nor is

OFAC aware, of any pending action by the Ungars to attach HLF's blocked attests.  See

Complaint ¶ 17.

## ARGUMENT

### I.    Plaintiffs' Suit Should Be Dismissed Because the Court Lacks Jurisdiction Over This Case.

A.  Plaintiffs' Claims Are Not Ripe.

As a threshold matter, plaintiffs' claims are not ripe under Article III of the United States

Constitution. See Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993) (explaining that

the "ripeness doctrine is drawn both from Article III limitations on judicial power and from

prudential reasons for refusing to exercise jurisdiction").  The purpose of the ripeness doctrine is

to "prevent the courts, through avoidance of premature adjudication, from entangling themselves

in abstract disagreements over administrative policies, and also to protect the agencies from

judicial interference until an administrative decision has been formalized and its effects felt in a

concrete way by the challenging parties."  Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967),

overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977).  To determine whether a

case is ripe for review, the court must "evaluate both the fitness of the issues for judicial decision

and the hardship to the parties of withholding court consideration."  Texas v. United States, 523

U.S. 296, 301 (1998) (internal quotations and citations omitted).

    With respect to the "fitness for judicial decision" prong, the Supreme Court has explained

that "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not

occur as anticipated, or indeed may not occur at all."  Id.  Here, plaintiffs' claims are unfit for

judicial review because OFAC has not taken any action to license the transfer of HLF's assets,

nor have plaintiffs, the Ungars, or another party moved to attach HLF's blocked assets.[7]  In light

of the absence of any action by OFAC, plaintiffs request that the court issue a declaratory

judgment about the legality of future OFAC action.  See Complaint ¶ 12 ("OFAC *would* violate

federal law *if* it released HLF's blocked funds to a plaintiff who obtained a default judgment

against 'Hamas' ") (emphasis added).  This request should be denied because plaintiffs are asking

the Court to review a hypothetical and contingent act that may not occur as plaintiffs anticipate,

---

[7] OFAC previously authorized the release of monies from the blocked HLF accounts so that HLF might pay its attorneys fees associated with litigating against the United States Government as well as against others, including the Ungar plaintiffs.  Following the denial of HLF's writ of certiorari in Holy Land, OFAC suspended access to blocked HLF funds for the payment of attorneys' fees.

or that may not occur at all.  For example, the Ungars may decide not to execute their judgment against Hamas by attaching HLF's blocked assets.  Furthermore, even if the Ungars attempt to attach HLF's blocked assets, they may not be able to establish, as both a legal and factual matter, that HLF is an "agency or instrumentality" of Hamas under section 201(a) of TRIA.  Finally, plaintiffs may not prevail in their suit against HLF for monetary damages, thus depriving them of any legal entitlement to HLF's blocked assets.  Because these issues remain unresolved at the present time, it is uncertain whether OFAC will ever license the transfer of HLF's assets to persons with judgments against a designated terrorist party.  Consequently, the Court would be acting prematurely if it issued a declaratory judgment as to the legality of some future OFAC action that may never come to pass.  See Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (stating that the "ripeness doctrine exists to prevent the courts from wasting our resources by prematurely entangling ourselves in abstract disagreements").

The "hardship to the parties" prong of the ripeness analysis "overlaps with the 'injury in fact' facet of standing doctrine." Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C. Cir. 1997).  Therefore, "the ripeness requirement excludes cases not involving present injury." Wyoming Outdoor Council v. United States Forest Service, 165 F.3d 43, 48 (D.C. Cir. 1999).  Moreover, when "an asserted injury is so speculative as to call standing into question, it may, as here, also involve assertions about future contingencies that make it unripe." Hotel and Restaurant Employees Union, Local 25 v. Smith, 846 F.2d 1499, 1517 (D.C. Cir. 1988).

In this case, plaintiffs will not be harmed if the Court declines judicial review because plaintiffs presently do not have a final monetary judgment against HLF.  More specifically, plaintiffs do not have a legally enforceable interest in HLF's blocked property such that they will

be injured if the Court dismisses their complaint.  The rights which plaintiffs seek to protect in

this action are entirely contingent upon the outcome of their pending suit for damages: if they do

not prevail in their suit against HLF, they will not have the right to attach HLF's blocked property

under TRIA.  Given plaintiffs' lack of an enforceable legal interest in HLF's property, they will

not suffer any harm if the Court declines to exercise jurisdiction over this case.

     Furthermore, even if plaintiffs ever obtain a legally enforceable interest in HLF's

property, they would have the opportunity to argue that HLF is not an "agency or instrumentality"

of Hamas in an appropriate judgment execution proceeding.  See Fed. R. Civ. P. 69(a) (providing

the process to enforce a judgment for the payment of money).  In the event the Ungars or another

competing litigant move to execute a monetary judgment against Hamas by attaching the blocked

property of HLF based on the theory that HLF is an "agency or instrumentality" of Hamas under

TRIA, the court with jurisdiction over the judgment execution proceeding will resolve the legal

and factual issues presented.  In such a proceeding, the judgment holder will have to establish

that HLF is an "agency or instrumentality" of Hamas, as both a legal and factual matter, before

the judgment execution court may authorize attachment of the blocked assets pursuant to section

201(a) of TRIA.  If plaintiffs had a legally enforceable interest in HLF's property, they could seek

to intervene in any such judgment execution proceeding pursuant to Federal Rule of Civil

Procedure 24 and present their arguments that HLF is not an "agency or instrumentality" of

Hamas.  See Florida Power & Light Co. v. EPA, 145 F.3d 1414, 1421 (D.C. Cir. 1988)

(concluding that plaintiff cannot satisfy the hardship prong of the ripeness analysis because

plaintiff "will have an opportunity to make the same arguments raised here" in another

proceeding and "the burden of participating in further administrative and judicial proceedings"

does "not constitute sufficient hardship for the purposes of ripeness").

Unlike the present case, the judgment execution proceeding would be a far superior

forum to address the "agency or instrumentality" issue because it would place the true adversaries

in this litigation–plaintiffs and the Ungars–in the same action.  The judgment execution court

will have the opportunity to evaluate the competing arguments of both parties and render an

informed decision with respect to whether HLF is an agency or instrumentality of Hamas.

Conversely, the present case is ill-suited for such an inquiry because the "agency or

instrumentality" issue is not before the Court, as neither the Ungars nor plaintiffs have moved to

execute a final monetary judgment against HLF's blocked assets.

Because the issues raised by plaintiffs' complaint are unfit for judicial decision at this

time and plaintiffs will not suffer any hardship if the Court withholds consideration of these

issues, plaintiffs' suit is not ripe and, therefore, should be dismissed.  See Fed. R. Civ. P.

12(b)(1).

     B.  Plaintiffs Do Not Have Standing to Pursue This Case Because They Do Not Have a
        Final Judgment For Monetary Damages Against HLF.

In addition to the plaintiffs' claims being unripe, plaintiffs also lack standing to pursue

this case.  To have standing to bring an action in federal court, plaintiffs must establish three

elements.  First, plaintiffs must allege an "injury-in-fact" that is "concrete and particularized and

actual or imminent, not conjectural or hypothetical."  Lujan v. Defenders of Wildlife, 504 U.S.

555, 560 (1992) (citations and internal punctuation omitted).  Second, plaintiffs must allege "a

causal connection between the injury and the conduct complained of—the injury has to be fairly

traceable to the challenged action of the defendant."  Id.  Third, "it must be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision." Id.

With regard to the injury-in-fact element, plaintiffs contend that they will suffer irreparable harm if HLF's blocked assets are distributed to the Ungars or to other parties who have judgments against Hamas because these judgments could completely exhaust HLF's assets. Plaintiffs' alleged injury, however, assumes that they will obtain a legal right to execute a judgment against HLF's assets at some point in the future.  Plaintiffs' right to attach HLF's blocked property is entirely contingent upon the outcome of their suit against HLF for monetary damages in Illinois.  This outcome is far from certain because plaintiffs have yet to obtain a final judgment and HLF has "vigorously contested" plaintiffs' suit in Illinois at every stage of the litigation.  See Pls' Brief, p. 5.  Indeed, if plaintiffs do not prevail in their suit for damages, they will suffer no injury in the event HLF's blocked assets are released to the Ungars or another competing party.

The D.C. Circuit has explained that a plaintiff seeking to establish an injury-in-fact "must show that the particularized injury is at least imminent in order to reduce the possibility that a court might unconstitutionally render an advisory opinion by deciding a case in which no injury would have occurred at all."  Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).  In this case, plaintiffs' injury-in-fact argument hinges entirely on the outcome of their damages suit against HLF.  Furthermore, plaintiffs have not alleged that they are likely to prevail in their action against HLF in the near future.  In fact, the more likely outcome is protracted litigation, given plaintiffs' representations that HLF continues to defend their suit.  See Affidavit of John M. Eubanks, in Support of Pls' Motion for Preliminary Injunction.  Due to the lack of imminent harm, there exists the very real possibility that the Court's decision–assuming

the Court grants plaintiffs' requested relief—could be rendered advisory if plaintiffs do not prevail in their damages suit against HLF.  At the present time, plaintiffs do not have a protected legal interest in HLF's blocked assets and they may not obtain one in the future.  See Claybrook v. Slater, 111 F.3d 904, 906 (D.C. Cir. 1997) (stating that an "injury in fact occurs when the defendant has invaded the plaintiff's legally protected interest").  Therefore, plaintiffs' alleged injury is based solely on conjecture and speculation as to the outcome of their pending suit in another federal court.  See Univ. Med. Center of Southern Nevada v. Shalala, 173 F.3d 438, 441 (D.C. Cir. 1999) (stating that an injury-in-fact must not be "hypothetical, abstract, or conjectural"); Gottlieb v. Fed. Election Comm'n, 143 F.3d 618, 621 (D.C. Cir. 1998) (holding that because plaintiffs' injury "rests on a series of hypothetical occurrences, none of which [plaintiffs] can demonstrate came to pass," plaintiffs' injury constitutes "gross speculation and is far too fanciful to merit treatment as an injury in fact") (internal quotations omitted); J. Roderick MacArthur Found. v. FBI, 102 F.3d 600, 606 (D.C. Cir. 1996) ("Because [plaintiff] does not allege that it has yet suffered any injury . . . [i]t is not enough for [plaintiff] to assert that it might suffer an injury in the future, or even that it is likely to suffer an injury at some unknown future time.  Such 'someday' injuries are insufficient" [to establish standing.]).  For this reason, plaintiffs have not alleged a sufficient "concrete and particularized" injury to meet Article III's standing requirement.

In addition to lacking an injury-in-fact, plaintiffs also have not established a causal connection between their alleged injury and OFAC's action.  As explained above, no such connection exists because OFAC has not taken action to license the transfer of HLF's assets to any judgment holders under TRIA.  Indeed, plaintiffs cannot identify any OFAC action that has

-18-

caused an injury to their legally protected rights or interests.  Consequently, plaintiffs do not have

standing to pursue this action and their complaint should be dismissed for lack of jurisdiction.

See Fed. R. Civ. P. 12(b)(1).

**II.     Plaintiffs Have Failed To State A Cause of Action Because OFAC Has Not Taken Final Agency Action Under the APA.**

The absence of any action by OFAC also reveals another reason why plaintiffs' complaint

should be dismissed:  OFAC has not engaged in final agency action, a necessary prerequisite for

stating a claim under the APA.  Although plaintiffs' complaint does not mention the APA,

plaintiffs' claims could be cognizable only under the APA as a challenge to OFAC action.  See

San Juan Audubon Soc'y v. Veneman,153 F. Supp. 2d 1, 4 (D.D.C. 2001) ("The APA governs

judicial review of agency action.").  The APA is the only relevant statute that could provide

plaintiffs with both a waiver of sovereign immunity and a cause of action to challenge OFAC's

action as unlawful.[8]  See 5 U.S.C. § 702; see also FDIC v. Meyer, 510 U.S. 471, 475 (1994)

("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from

suit.").  Indeed, even without reference to the APA, plaintiffs' complaint reflects the fact that they

---

[8] Section 201(a) of TRIA does not create a private right of action.  Although plaintiffs rely on 28 U.S.C. §§ 1331, 1346(a)(2), and 1361 for the proposition that the Court has jurisdiction over this case, neither these provisions nor the Declaratory Judgment Act, 28 U.S.C. § 2201, provide plaintiffs with an independent cause of action.  See Montana-Dakota Utils. Co. v. Northwestern Pub. Servs. Co., 341 U.S. 246, 249 (1951) ("As frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action.  The Judicial Code, in vesting jurisdiction in the District Courts, does not create causes of action, but only confers jurisdiction to adjudicate those arising from other sources which satisfy its limiting provisions.") Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950) (explaining that the Declaratory Judgment Act does not enlarge the jurisdiction of federal courts or create an independent cause of action, but merely widens the range of remedies that federal courts have at their disposal).

are challenging the legality of OFAC action, albeit future OFAC action.  See Complaint ¶ 13

("OFAC would violate federal law if it released HLF's blocked funds to a plaintiff who obtained

a default judgment against 'Hamas' ").  Therefore, plaintiffs' suit is properly characterized as an

APA challenge alleging that OFAC would violate section 201(a) of TRIA if it releases HLF's

blocked property to persons other than those who have in personam judgments against HLF.  See

5 U.S.C. § 706 (stating that the "reviewing court shall . . . hold unlawful . . . agency action . . .

not in accordance with law").

    Pursuant to well-establish precedent, however, plaintiffs cannot state a claim under the

APA because OFAC has not taken any "final agency action," nor have plaintiffs identified any

final OFAC action in their complaint.  See 5 U.S.C. § 704 (stating that only final agency action is

subject to judicial review); Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety

Comm'n, 324 F.3d 726, 731 (D.C. Cir. 2003) (concluding that final agency action arguments

should be evaluated under Fed. R. Civ. P. 12(b)(6)–as opposed to 12(b)(1)–because absent final

agency action, "there is no doubt that appellant would lack a cause of action under the APA.").

The United States Supreme Court explained the standard for determining whether an agency

action is a "final agency action" under the APA in Bennett v. Spear, 520 U.S. 154 (1997):

> As a general matter, two conditions must be satisfied for agency action to be
> "final":  First, the action must mark the "consummation" of the agency's
> decisionmaking process, Chicago & Southern Air Lines, Inc. v. Waterman S.S.
> Corp., 333 U.S. 103, 113, 68 S. Ct. 431, 437, 92 L. Ed. 568 (1948) - it must not be
> of a merely tentative or interlocutory nature.  And second, the action must be one
> by which "rights or obligations have been determined," or from which "legal
> consequences will flow," Port of Boston Marine Terminal Assn. v.
> Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S. Ct. 203, 209-10, 27
> L.Ed.2d 203 (1970).

Id. at 177-78.

Applying this standard, plaintiffs' complaint fails on both counts. First, plaintiffs' claims are not subject to judicial review because OFAC has taken no action to license the transfer of HLF's assets to persons with judgments against terrorist parties or their agents or instrumentalities. Indeed, plaintiffs' complaint does not identify any OFAC action, let alone tentative or interlocutory action, for the Court to review. In the absence of actual OFAC action, plaintiffs request that the Court issue an advisory opinion concerning the legality of hypothetical future OFAC action. See Complaint ¶ 12 ("OFAC *would* violate federal law *if* it released HLF's blocked funds to a plaintiff who obtained a default judgment against 'Hamas' "); ¶ 15 ("The Boims will suffer irreparable damage *if* the blocked funds of HLF . . . are unlawfully disbursed.") (emphasis added). Such an opinion would conflict not only with the APA's final agency action requirement but with longstanding precedent prohibiting federal courts from issuing advisory opinions. See Flast v. Cohen, 392 U.S. 83, 96-97 (1968) (stating that federal courts may not issue advisory opinions).

Second, OFAC has taken no action that impacts plaintiffs' rights. To constitute final agency action, "[t]he agency must have made up its mind, and its decision must have "inflicted an actual, concrete injury" upon the party seeking judicial review." AT&T Co. v. EEOC, 270 F.3d 973, 975 (D.C. Cir. 2001) (internal quotations omitted). Plaintiffs' complaint does not identify any OFAC action, order, or regulation that has caused them injury. Instead, plaintiffs merely allege that they may be injured in the future if HLF's blocked assets are released to persons who have judgments against Hamas. See Complaint ¶¶ 12, 15. As explained above, this allegation is insufficient to rise to the level of final agency action because it is premised on contingent events that are uncertain to occur. See AT&T Co., 270 F.3d at 975-76 (holding that

no final agency action existed in APA suit based on allegation that agency might file suit against plaintiff in the future); see also Indep. Petroleum Ass'n of America v. Babbitt, 971 F. Supp. 19, 28 (D.D.C. 1997) (stating that the purpose of the final agency action rule is to avoid "premature judicial intervention").

Because plaintiffs have failed to allege that OFAC has taken "final agency action," as required under the APA, plaintiffs have failed to state a cause of action.  Accordingly, the Court should dismiss plaintiffs' complaint and deny plaintiffs' motion for preliminary injunction.  See Fed. R. Civ. P. 12(b)(6).

### III.   Plaintiffs Have Failed to State a Claim Because TRIA Authorizes Judgment Holders To Execute Against the Blocked Assets of Agents and Instrumentalities of Terrorist Parties.

Even assuming that the Court has jurisdiction over this case and plaintiffs have raised a valid cause of action, plaintiffs have failed to state a claim upon which relief can be granted because the text of section 201(a) of TRIA conflicts with plaintiffs' proposed construction. Plaintiffs argue that the "*Ungar* plaintiffs should not be permitted to utilize TRIA to attach the blocked HLF assets because they have failed to obtain a judgment against HLF as a party to a lawsuit."  Pls. Brief, p. 8.  More directly, plaintiffs contend that because the Ungars sued Hamas, not HLF, they should not be permitted to satisfy their judgment against Hamas by attaching the blocked assets of HLF.  Consequently, plaintiffs request that the Court construe section 201(a) of TRIA to permit disbursement of a designated terrorist entity's blocked assets "only to parties who have a judgment *in personam* against that terrorist entity."  See Complaint ¶ 21.  Plaintiffs' claim fails as a matter of law because this proposed construction conflicts with the TRIA's plain text.

"In a statutory construction case, the beginning point must be the language of the statute,

and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 474 (1992).  In contrast to plaintiffs' strained construction, TRIA's plain language unambiguously provides that parties with judgments against terrorist parties may satisfy those judgments against certain assets of "that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)."[9]  116 Stat. 2337, TRIA § 201(a).  The inclusion of the parenthetical "(including the blocked assets of any agency or instrumentality of that terrorist party)" means that persons with judgments against terrorist parties may satisfy their judgments by attaching not only the blocked assets of the terrorist party against whom they have an in personam judgment, but the blocked assets of "any agency or instrumentality of that terrorist party" as well.[10]  TRIA does not require that a person must have a judgment against an agency or instrumentality of a terrorist party in order to attach the blocked assets of that agency or instrumentality.  Instead, TRIA's plain language provides that a person need only have a

_____

[9] The relevant portion of section 201(a) provides:
[T]he blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.
116 Stat. 2337, TRIA § 201(a)

[10] For example, the Ungar plaintiffs presently have a final judgment for monetary damages against Hamas, a designated terrorist party.  Therefore, under TRIA, the Ungars may seek to satisfy their judgment by attaching the blocked assets of Hamas as well as the blocked assets of "any agency or instrumentality of" Hamas.  Similarly, if plaintiffs prevail in their suit against HLF, another designated terrorist party, they may attempt to satisfy their judgment by attaching the assets of HLF as well as the blocked assets of "any agency or instrumentality of" HLF.

judgment against a designated terrorist party, in which case, that person may attempt to execute the judgment against both the blocked assets of "that terrorist party" and the blocked assets "any agency or instrumentality of that terrorist party."

Plaintiffs' proposed construction, which would limit TRIA's scope such that persons with judgments against a terrorist party could only execute their judgment against the blocked assets of that terrorist party, is wrong because it completely ignores the "agency or instrumentality" language included in the statute's parenthetical.  Indeed, in order to adopt plaintiffs' construction of section 201(a), the Court would have to rewrite the statute, thereby deleting the agency or instrumentality parenthetical from the statute altogether.  This construction would do violence to TRIA's plain language as well as impermissibly intrude into Congress' legislative prerogative. See United States v. Ron Pair Entrs., Inc., 489 U.S. 235, 241 (1989) (stating that when "the statute's language is plain, the sole function of the courts is to enforce it according to its terms"); Blount v. Rizzi, 400 U.S. 410, 419 (1971) (stating that "it is for Congress, not this Court, to rewrite the statute").  Because section 201(a) of TRIA provides that persons with judgments against a terrorist party may attach the blocked assets of "that terrorist party" as well as the blocked assets of "any agency or instrumentality of that terrorist party," plaintiffs cannot succeed on the merits of their claim and their complaint should be dismissed.

As a consequence of the fact that TRIA's text directly contradicts plaintiffs' position, plaintiffs attempt to obscure the issues before the Court by arguing that they are likely to succeed on the merits of their claim because HLF is not an "agency or instrumentality" of Hamas for purposes of TRIA.  See Pls' Brief 7-8.  This issue is not before the Court.  Here, plaintiffs have requested a limiting construction of TRIA in an attempt to enjoin OFAC from releasing HLF's

blocked assets to any party who has not obtained a final judgment against HLF.  See Complaint ¶ 18.  As explained above, such a construction is at odds with TRIA's plain language.

Whether HLF is an "agency or instrumentality" of Hamas for purposes of TRIA is an issue for a court with jurisdiction over a judgment execution proceeding in which a party who has obtained a final judgment for monetary damages against Hamas (e.g., the Ungars) moves to execute that judgment against HLF's blocked property.  See Fed. R. Civ. P. 69(a).  Therefore, the court hearing the judgment execution proceeding will determine the appropriate legal standard governing TRIA's "agency or instrumentality" inquiry and, moreover, whether the judgment holder has met this standard as a factual matter in order to warrant attachment of the blocked assets.[11]

More importantly, however, the fact that a court may eventually have jurisdiction over a judgment execution proceeding involving HLF's blocked assets does not make plaintiffs' proposed construction of section 201(a) correct.  Plaintiffs' construction, which would eliminate any reference to TRIA's agency or instrumentality language, is plainly at odds with the statutory text.  Accordingly, plaintiffs' complaint should be dismissed for failing to state a claim.  See Fed. R. Civ. P. 12(b)(6).

**IV.    Plaintiffs Cannot Satisfy the Requirements for Preliminary Injunctive Relief.**

In addition to failing to demonstrate a likelihood of success on the merits of their claim, see part III supra, plaintiffs have not established the remaining requirements for a preliminary

---

[11] Although plaintiffs contend that TRIA's "agency or instrumentality" inquiry should be governed by FSIA's three-prong "agency or instrumentality" test, see 28 U.S.C. § 1603(a), this question remains unresolved as no court has had the opportunity to address this issue.  As explained above, the Court need not resolve this issue in the present case.

injunction.  The standards for obtaining preliminary injunctive relief in the D.C. Circuit require the moving party to establish:  "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction."  Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  "These factors must be balanced against each other, but it is especially important for the movant to demonstrate a likelihood of success on the merits."  Nat'l Head Start Ass'n v. Dep't of Health & Human Servs., 297 F. Supp. 2d 242, 247 (D.D.C. 2004); see Davenport v. Int'l Broth. of Teamsters, AFL-CIO, 166 F.3d 356, 366 (D.C. Cir. 1999) (concluding that absent a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiffs' favor").

As explained above, see parts I-II supra, plaintiffs will not suffer irreparable injury if the Court denies their proposed injunction because they have yet to obtain a final judgment against HLF for monetary damages.  "It is axiomatic that speculative injury will not support emergency injunctive relief, and that the threat of irreparable injury must be real and imminent."  Getty Images News Servs. Corp. v. Dep't of Defense, 193 F. Supp. 2d 112, 122 (D.D.C. 2002); see Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). ("First, the injury must be both certain and great; it must be actual and not theoretical. Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time . . . .") (internal quotations omitted).  Because plaintiffs' alleged injury is entirely contingent on the outcome of their pending damages suit against HLF, plaintiffs have not established the type of "real and imminent" injury justifying the imposition of preliminary injunctive relief.

Furthermore, plaintiffs will not suffer irreparable injury if the Court denies their proposed injunction because plaintiffs will have the opportunity to argue that HLF is not an "agency or instrumentality" of Hamas in an appropriate judgment execution proceeding.  As discussed above, the court with jurisdiction over the judgment execution proceeding will resolve whether HLF is an "agency or instrumentality" of Hamas.  Plaintiffs will not be injured if the present action is dismissed because they may seek to intervene in the judgment execution proceeding and present their arguments why HLF is not an "agency or instrumentality" of Hamas.

In contrast to plaintiffs, OFAC will suffer substantial harm if the Court grants plaintiffs' proposed injunction, which would prevent OFAC "from releasing any blocked assets of [HLF] to any plaintiff who has not obtained a judgment against [HLF,]" because such a broad injunction infringes on OFAC's licensing authority.  See Pls' Proposed Order.  Pursuant to the regulations issued by OFAC to implement IEEPA and Executive Orders 12,947 and 13,244, the blocked property of designated terrorist parties is generally immune from attachment or execution by judgment creditors.  See 31 C.F.R. § 594.202(e) ("Except to the extent otherwise provided by law or unless licensed pursuant to this part, any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void . . . .").  Section 201(a) of TRIA provides a legal basis for persons with judgments against terrorist parties to satisfy those judgments against certain blocked assets.  Otherwise, OFAC retains plenary authority and discretion to release blocked property for various purposes through the issuance of specific or general licenses.[12]  See 31 C.F.R. § 501.801 (explaining OFAC's licensing authority); see also Dames & Moore, 453

_____

[12] Of particular relevance to this case, OFAC previously licensed the release of monies from the blocked HLF accounts so that HLF might pay its attorneys fees.  See supra note 7.

U.S. at 673 ("This Court has previously recognized that the congressional purpose in authorizing

blocking orders is to put control of foreign assets in the hands of the President.") (internal

quotations omitted).  In this case, plaintiffs' proposed injunction impinges on this discretion by

prohibiting OFAC from releasing HLF's blocked assets to anyone other than persons who have in

personam judgments against HLF.  In addition to conflicting with the plain language of section

201(a) of TRIA, such a broad injunction will interfere with OFAC's licensing authority under

IEEPA and its Executive Orders.

Finally, the public interest will not be furthered by plaintiffs' proposed construction of

section 201(a) of TRIA.  As described above, plaintiffs' proposed construction of section 201(a)

would alter the scope of TRIA's remedial power by limiting attachment of blocked terrorist assets

only to those persons who have in personam judgments against that terrorist party.  This

proposed construction is at odds with the plain terms of the statute as enacted by Congress and as

signed into law by the President.  Judicial rewriting of an Act of Congress in circumstances such

as those presented herein undermines the public interest by substituting this Court's view for that

of the people's elected representatives.  Plaintiffs offer no valid basis for granting their request to

take such action, and their requested relief, accordingly, should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, OFAC's motion to dismiss should be granted and plaintiffs'

motion for preliminary injunction should be denied.

Dated:  July 12, 2004                    Respectfully submitted,

                                         PETER D. KEISLER
                                         Assistant Attorney General

                                         KENNETH L. WAINSTEIN
                                         United States Attorney

                                         VINCENT GARVEY
                                         Deputy Branch Director

                                         /S/ Andrew I. Warden
                                         ANDREW I. WARDEN, IN # 23840-49
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Ave., NW, Room 6120
                                         Washington, DC  20530
                                         Tel.: (202) 616-5084
                                         Fax: (202) 616-8460
                                         e-mail:  andrew.warden@usdoj.gov